Amy F. Sorenson (8947)
Douglas P. Farr (13208)
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Salt Lake City, Utah  84101
Telephone:  801.257.1900
Facsimile:  801.257.1800
Email: asorenson@swlaw.com
      dfarr@swlaw.com

*Attorneys for Defendants Helm Pacific
a.k.a. Helm Pacific Leasing, and First
Union Rail Corporation d/b/a Wells Fargo Rail*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BLACK IRON, LLC, a Utah limited liability company;<br><br>    Plaintiff,<br><br>vs.<br><br>HELM PACIFIC aka HELM PACIFIC LEASING, a Nebraska general partnership; FIRST UNION RAIL CORPORATION d/b/a WELLS FARGO RAIL, a North Carolina corporation; CML HOLDINGS, a Delaware corporation; CML METALS CORPORATION, a corporation; MICHAEL W. CONBOY, an individual, DOES 1-15; and ROES 1-15,<br><br>    Defendants. | **NOTICE OF REMOVAL OF ACTION TO U.S. DISTRICT COURT**<br><br><br>Judge Brooke C. Wells<br><br>Civil No. 2:16-cv-00873-BCW |

Defendants Helm Pacific a.k.a. Helm Pacific Leasing ("Helm Pacific") and First Union

Rail Corporation d/b/a Wells Fargo Rail ("Wells Fargo Rail") (collectively, the "Wells Fargo

Defendants") hereby give notice that the above-styled action has been removed to the United

24618653

States District Court for the District of Utah, Central Division, of the claims that have been asserted against the Wells Fargo Defendants in the above-entitled action from the Fifth Judicial District Court of the State of Utah, Iron County, Case No. 160500102.  This Notice of Removal is filed pursuant to 28 U.S.C. §§ 1441 and 1446.  As grounds for removal, the Wells Fargo Defendants state:

1.      On or about July 12, 2016, Black Iron, LLC ("Black Iron"), with the filing of the Complaint, commenced this action in the Fifth Judicial District Court of the State of Utah, Iron County, Case No. 160500102 ("State Court Action").

2.      The Wells Fargo Defendants received a copy of the Complaint on July 12, 2016.  A copy of the Complaint received by the Wells Fargo Defendants is attached hereto as "Exhibit A – Complaint."  Removal is, therefore, timely under 28 U.S.C. § 1446(b).

3.      Under 28 U.S.C. § 1441, this Court is the appropriate forum in which to file this Notice of Removal because the United States District Court for the District of Utah, Central Division is the federal judicial district embracing Iron County, Utah, the county in which the State Court Action was filed.

### Diversity

4.      Upon information and belief, Black Iron is a Utah limited liability company, with a principal place of business in Iron and/or Washington Counties, Utah.   For diversity jurisdiction purposes, the Court must consider the citizenship of all members of a limited liability company.  Siloam Springs Hotel, L.L.C. v. Century Sur. Co., 781 F.3d 1233, 1235-36 (10th Cir. 2015) (holding that "for purposes of diversity jurisdiction . . . an LLC's citizenship is determined by reference to the citizenship of each and every one of its members").  Upon information and belief, Black Iron has three members—Steve L. Gilbert, Keith Gilbert, and Andrea Jolley—each of whom is domiciled in Iron County or Washington County, Utah.  Thus, for diversity purposes, Black Iron is a citizen of the State of Utah.

2

24618653

5. Helm Pacific is a general partnership existing under the laws of the State of Nebraska, with a principal place of business in Cook County, Illinois. For diversity jurisdiction purposes, the Court must consider the citizenship of all members of a partnership. Carden v. Arkoma Assocs., 494 U.S. 185, 195-96 (1990) (holding that "diversity jurisdiction . . . depends on the citizenship of 'all the members'" of a partnership). For purposes of federal diversity jurisdiction, "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1). The general partners of Helm Pacific are (i) First Union Rail Corporation (n/k/a Wells Fargo Rail Corporation), a North Carolina corporation with its principal place of business in Cook County, Illinois, and (ii) Union Pacific Venture Leasing, Inc., a Delaware corporation with its principal place of business in Omaha, Nebraska. Thus, for diversity jurisdiction purposes, Helm Pacific is a citizen of North Carolina, Illinois, Delaware, and Nebraska.

6. Upon information and belief, Defendant CML Holdings is a Delaware corporation with a principal place of business in Iron County or Washington County, Utah. Thus, for diversity jurisdiction purposes, CML Holdings is a citizen of Delaware and Utah. However, as discussed below, CML Holdings' citizenship should not be considered for diversity purposes.

7. Upon information and belief, Defendant CML Metals Corporation ("CML Metals") is a Utah corporation with its principal place of business in Iron County or Washington County, Utah. Thus, for diversity purposes, CML Metals is a citizen of Utah. However, as discussed below, CML Metals' citizenship should not be considered for diversity purposes.

8. Upon information and belief, Mr. Conboy is an individual domiciled in New York. In determining citizenship for an individual, the Court is to look at the individual's domicile. Siloam Springs Hotel, L.L.C., 781 F.3d at 1238 ("An individual's . . . domicile . . . is relevant for determining citizenship."). Thus, for diversity jurisdiction purposes, Mr. Conboy is

24618653

a citizen of New York. However, as discussed below, Mr. Conboy's citizenship should not be considered for diversity purposes.

9. Diversity of citizenship generally requires that "[n]o plaintiff can be a citizen of the same state as any defendant." Salt Lake Publ. Co. v. AT&T Corp., 320 F.3d 1081, 1096 (10th Cir. 2003). Here, Plaintiff Black Iron shares the same state of citizenship—Utah—as CML Holdings and CML Metals. But where a party is fraudulently joined to defeat diversity, the party's citizenship should be ignored for purposes of assessing complete diversity. Dutcher v. Matheson, 733 F.3d 980, 988 (10th Cir. 2013). "To establish fraudulent joinder, the removing party must demonstrate either: (1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court." Id. (internal quotation, citation, and alteration omitted). "Furthermore, although consent of all defendants is typically required for removal, it is well established that the rule requiring defendants to agree to removal does not apply to any defendant who is fraudulently joined." Sycamore Family LLC v. Earthgrains Baking Cos., 2013 WL 5883868, *2 (D. Utah Nov. 1, 2013).

10. Here, CML Holdings, CML Metals, and Mr. Conboy[1] (collectively, the "CML Defendants") were fraudulently joined because Black Iron is unable to establish a cause of action against the CML Defendants. Black Iron asserts a sole cause of action against the CML Defendants for promissory estoppel/indemnity. Black Iron's Complaint alleges the following:

(1)    "Black Iron executed a note in favor of Conboy ('Note')." (Compl. ¶ 84.)

(2)    "The amount of the Note is $2,902,900.06." (Compl. ¶ 85.)

(3)    "Black Iron executed the Note and the Asset Purchase Agreement in reliance on the promise from CML to indemnify Black Iron by retaining claims between CML and [the Wells Fargo Defendants]." (Compl. ¶ 86.)

---

[1] Mr. Conboy is a representative of Luxor Capital, an investor in CML Metals.

4

24618653

(4)   "Conboy promised to retain claims and indemnify Black Iron from liability, charges, costs, expenses, or losses associated with [the Wells Fargo Defendants] and the railroad." (Compl. ¶ 87.)

(5)   "Upon information and belief, when Conboy made his promises to Black Iron, he may have been acting individually or on behalf of CML and/or the instance of its officers and directors."  (Compl. ¶ 88.)

(6)   "Conboy, CML and ROES 1-15 are equitably bound to resolve all matters relating to the storage and removal of the railcars and locomotives."  (Compl. ¶ 89.)

11.   Any claim against CML Holdings, CML Metals and Conboy fails as a matter of law.  The Asset Purchase Agreement ("APA") referenced by Black Iron was executed by and between Gilbert Development Corporation ("GDC") and CML Metals.  GDC's interest was later assigned to Black Iron.  The APA is a fully integrated agreement.  (See APA, at § 5.08, attached hereto as Exhibit B.[2])  The APA does not contain an indemnification provision.  Similarly, the Note, which is attached to the APA, does not include an indemnity agreement.  (See APA, at Ex. B to Schedule 1.02.)  Accordingly, Black Iron cannot maintain a claim against CML Holdings, CML Metals or Mr. Conboy for promissory estoppel/indemnification based on the plain language of the agreements.

12.   Moreover, the Complaint's conclusory allegations do not satisfy the requisite pleading requirements of Rule 8(a).  In order to survive a motion to dismiss, a plaintiff must provide "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 547 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

---

[2] The APA was produced to the Wells Fargo Defendants as "Confidential" under the Court's Standard Protective Order.  Therefore, the Wells Fargo Defendants will seek leave to file the APA under seal as Exhibit B once this Notice of Removal is filed with the Court and a federal case number has been assigned.

24618653

for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Black Iron fails to do this. The Complaint lacks the necessary facts to support Black Iron's claim for promissory estoppel/indemnification.

13.     Finally, in a lawsuit previously filed with this Court, the Wells Fargo Defendants have asserted affirmative claims against Black Iron. (See CML Metals Corp. v. First Union Rail Corp., k/n/a Wells Fargo Rail Corp. (the "First Lawsuit"), Case No. 2:15-cv-00152-JNP-DBP, United States District Court, District of Utah, at Doc. Nos. 38, 80-81.) Specifically, the Wells Fargo Defendants assert that CML Metals fraudulently transferred its assets to Black Iron pursuant to the APA. (Id.) These claims have been pending since August 19, 2015. (Id.)

14.     Black Iron's causes of action in this Complaint are compulsory counterclaims that should have been filed in the First Lawsuit because they arise out of the same transaction or occurrence. For a claim to be compulsory, the claim must "arise[] out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(a). The Tenth Circuit follows a "flexible and realistic" approach to the transaction or occurrence requirement:

> Rather than attempting to define the key terms of Rule 13(a), most courts . . . have preferred to suggest standards by which the compulsory or permissive nature of specific counterclaims may be determined . . . by posing four questions: (1) Are the issues of fact and law raised by the claim and counterclaim largely the same? (2) Would res judicata bar a subsequent suit on defendants' claim absent the compulsory counterclaim rule? (3) Will substantially the same evidence support or refute plaintiffs' claim as well as defendants' counterclaim? and (4) Is there any logical relation between the claim and counterclaim? Of these questions . . . the 'logical relation' test is the most controlling.

United States v. Questar Gas Mgmt. Co., No. 2:08-cv-167-DAK, 2010 WL 2813779, at *2 (D. Utah July 16, 2010) (internal quotations and citations omitted).

15.     Here, there is a logical relation between the Wells Fargo Defendants' fraudulent transfer claims and Black Iron's storage costs claims. The fraudulent transfer claims center on the transfer of CML Metal's assets to Black Iron through the APA. The transferred assets

6

24618653

include the land and railroad tracks at issue in Black Iron's claims. Essentially, the Wells Fargo Defendants claim that Black Iron is not entitled to certain assets (including land on which the railroad tracks are located) and Black Iron now claims damages arising out of its purchase of those very same assets. This relationship is strengthened by the fact that Black Iron appears to calculate the alleged "storage" costs as beginning to accrue on June 1, 2015 – a little more than a month after Black Iron acquired the assets at issue from CML Metals.

### Amount in Controversy

16.     The amount in controversy in this matter exceeds $75,000, exclusive of interest and costs. Pursuant to the Complaint, Black Iron seeks a judgment in the amount of $17,391,000.00 for storage costs, prejudgment interest in the amount of $913,452.71, and incidental and consequential damages in the amount of $10,000,000.00. (See Compl. at Prayer for Relief.)

17.     As a result, this is a civil action of which this Court has original jurisdiction pursuant to 28 U.S.C. § 1332, and is one which may be removed to this Court by the Wells Fargo Defendants pursuant to the provisions of 28 U.S.C. § 1441 in that it is a civil action between citizens of different States and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

### Filing and Service

18.     A copy of this Notice of Removal and related documents is being served this day by mail and electronic filing on Plaintiff.

19.     Pursuant to 28 U.S.C. § 1446, counsel for the Wells Fargo Defendants have caused a copy of a Notice of Removal to be filed with the Clerk of the Fifth Judicial District Court of the State of Utah, Iron County.

20.     Also filed concurrently herewith is an Appendix containing copies of all pleadings in the State Court Action. This Appendix is attached hereto as "Exhibit C –

24618653

Appendix."

WHEREFORE, the Wells Fargo Defendants respectfully requests that this Notice of Removal be filed, the State Court Action be removed to and proceed hereafter in this Court, and no further proceedings be had in the Fifth Judicial District Court of the State of Utah.

DATED this 11th day of August, 2016.

SNELL & WILMER L.L.P.


/s/ Douglas P. Farr
Amy F. Sorenson
Douglas P. Farr

*Attorneys for Defendants Helm Pacific*
*a.k.a. Helm Pacific Leasing, and First*
*Union Rail Corporation d/b/a Wells Fargo Rail*

8

24618653

## CERTIFICATE OF SERVICE

I certify that on this 11th day of August, 2016, a true and correct copy of the foregoing

NOTICE OF REMOVAL OF ACTION TO U.S. DISTRICT COURT sent via first-class mail, to

the following:

Dana T. Farmer, Thomas W. Farrell, Ken Brown, SMITH KNOWLES, P.C., 2225 Washington Blvd., Suite 200, Ogden, UT 8440 l

Cyndi W. Gilbert
P.O. Box 190
1091 South Toquerville Blvd.
Toquerville, UT 84774

/s/ *Douglas P. Farr*

24618653

States District Court for the District of Utah, Central Division, of the claims that have been asserted against the Wells Fargo Defendants in the above-entitled action from the Fifth Judicial District Court of the State of Utah, Iron County, Case No. 160500102.  This Notice of Removal is filed pursuant to 28 U.S.C. §§ 1441 and 1446.  As grounds for removal, the Wells Fargo Defendants state:

1.      On or about July 12, 2016, Black Iron, LLC ("Black Iron"), with the filing of the Complaint, commenced this action in the Fifth Judicial District Court of the State of Utah, Iron County, Case No. 160500102 ("State Court Action").

2.      The Wells Fargo Defendants received a copy of the Complaint on July 12, 2016.  A copy of the Complaint received by the Wells Fargo Defendants is attached hereto as "Exhibit A – Complaint."  Removal is, therefore, timely under 28 U.S.C. § 1446(b).

3.      Under 28 U.S.C. § 1441, this Court is the appropriate forum in which to file this Notice of Removal because the United States District Court for the District of Utah, Central Division is the federal judicial district embracing Iron County, Utah, the county in which the State Court Action was filed.

**Diversity**

4.      Upon information and belief, Black Iron is a Utah limited liability company, with a principal place of business in Iron and/or Washington Counties, Utah.  For diversity jurisdiction purposes, the Court must consider the citizenship of all members of a limited liability company.  Siloam Springs Hotel, L.L.C. v. Century Sur. Co., 781 F.3d 1233, 1235-36 (10th Cir. 2015) (holding that "for purposes of diversity jurisdiction . . . an LLC's citizenship is determined by reference to the citizenship of each and every one of its members").  Upon information and belief, Black Iron has three members—Steve L. Gilbert, Keith Gilbert, and Andrea Jolley—each of whom is domiciled in Iron County or Washington County, Utah.  Thus, for diversity purposes, Black Iron is a citizen of the State of Utah.

2

24618653

5.      Helm Pacific is a general partnership existing under the laws of the State of Nebraska, with a principal place of business in Cook County, Illinois.  For diversity jurisdiction purposes, the Court must consider the citizenship of all members of a partnership.  Carden v. Arkoma Assocs., 494 U.S. 185, 195-96 (1990) (holding that "diversity jurisdiction . . . depends on the citizenship of 'all the members'" of a partnership).  For purposes of federal diversity jurisdiction, "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."  28 U.S.C. § 1332(c)(1).  The general partners of Helm Pacific are (i) First Union Rail Corporation (n/k/a Wells Fargo Rail Corporation), a North Carolina corporation with its principal place of business in Cook County, Illinois, and (ii) Union Pacific Venture Leasing, Inc., a Delaware corporation with its principal place of business in Omaha, Nebraska.  Thus, for diversity jurisdiction purposes, Helm Pacific is a citizen of North Carolina, Illinois, Delaware, and Nebraska.

6.      Upon information and belief, Defendant CML Holdings is a Delaware corporation with a principal place of business in Iron County or Washington County, Utah.  Thus, for diversity jurisdiction purposes, CML Holdings is a citizen of Delaware and Utah.  However, as discussed below, CML Holdings' citizenship should not be considered for diversity purposes.

7.      Upon information and belief, Defendant CML Metals Corporation ("CML Metals") is a Utah corporation with its principal place of business in Iron County or Washington County, Utah.  Thus, for diversity purposes, CML Metals is a citizen of Utah.  However, as discussed below, CML Metals' citizenship should not be considered for diversity purposes.

8.      Upon information and belief, Mr. Conboy is an individual domiciled in New York.  In determining citizenship for an individual, the Court is to look at the individual's domicile.  Siloam Springs Hotel, L.L.C., 781 F.3d at 1238 ("An individual's . . . domicile . . . is relevant for determining citizenship.").  Thus, for diversity jurisdiction purposes, Mr. Conboy is

3

a citizen of New York.  However, as discussed below, Mr. Conboy's citizenship should not be considered for diversity purposes.

9.      Diversity of citizenship generally requires that "[n]o plaintiff can be a citizen of the same state as any defendant."  Salt Lake Publ. Co. v. AT&T Corp., 320 F.3d 1081, 1096 (10th Cir. 2003).  Here, Plaintiff Black Iron shares the same state of citizenship—Utah—as CML Holdings and CML Metals.  But where a party is fraudulently joined to defeat diversity, the party's citizenship should be ignored for purposes of assessing complete diversity.  Dutcher v. Matheson, 733 F.3d 980, 988 (10th Cir. 2013).  "To establish fraudulent joinder, the removing party must demonstrate either: (1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court."  Id. (internal quotation, citation, and alteration omitted).  "Furthermore, although consent of all defendants is typically required for removal, it is well established that the rule requiring defendants to agree to removal does not apply to any defendant who is fraudulently joined."  Sycamore Family LLC v. Earthgrains Baking Cos., 2013 WL 5883868, *2 (D. Utah Nov. 1, 2013).

10.     Here, CML Holdings, CML Metals, and Mr. Conboy[1] (collectively, the "CML Defendants") were fraudulently joined because Black Iron is unable to establish a cause of action against the CML Defendants.  Black Iron asserts a sole cause of action against the CML Defendants for promissory estoppel/indemnity.  Black Iron's Complaint alleges the following:

(1)      "Black Iron executed a note in favor of Conboy ('Note')."  (Compl. ¶ 84.)

(2)      "The amount of the Note is $2,902,900.06."  (Compl. ¶ 85.)

(3)      "Black Iron executed the Note and the Asset Purchase Agreement in reliance on the promise from CML to indemnify Black Iron by retaining claims between CML and [the Wells Fargo Defendants]."  (Compl. ¶ 86.)

---

[1] Mr. Conboy is a representative of Luxor Capital, an investor in CML Metals.

4

(4)    "Conboy promised to retain claims and indemnify Black Iron from liability, charges, costs, expenses, or losses associated with [the Wells Fargo Defendants] and the railroad." (Compl. ¶ 87.)

(5)    "Upon information and belief, when Conboy made his promises to Black Iron, he may have been acting individually or on behalf of CML and/or the instance of its officers and directors." (Compl. ¶ 88.)

(6)    "Conboy, CML and ROES 1-15 are equitably bound to resolve all matters relating to the storage and removal of the railcars and locomotives." (Compl. ¶ 89.)

11.    Any claim against CML Holdings, CML Metals and Conboy fails as a matter of law. The Asset Purchase Agreement ("APA") referenced by Black Iron was executed by and between Gilbert Development Corporation ("GDC") and CML Metals. GDC's interest was later assigned to Black Iron. The APA is a fully integrated agreement. (See APA, at § 5.08, attached hereto as Exhibit B.[2]) The APA does not contain an indemnification provision. Similarly, the Note, which is attached to the APA, does not include an indemnity agreement. (See APA, at Ex. B to Schedule 1.02.) Accordingly, Black Iron cannot maintain a claim against CML Holdings, CML Metals or Mr. Conboy for promissory estoppel/indemnification based on the plain language of the agreements.

12.    Moreover, the Complaint's conclusory allegations do not satisfy the requisite pleading requirements of Rule 8(a). In order to survive a motion to dismiss, a plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 547 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

---

[2] The APA was produced to the Wells Fargo Defendants as "Confidential" under the Court's Standard Protective Order. Therefore, the Wells Fargo Defendants will seek leave to file the APA under seal as Exhibit B once this Notice of Removal is filed with the Court and a federal case number has been assigned.

5

24618653

for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Black Iron fails to do this. The Complaint lacks the necessary facts to support Black Iron's claim for promissory estoppel/indemnification.

13. Finally, in a lawsuit previously filed with this Court, the Wells Fargo Defendants have asserted affirmative claims against Black Iron. (See CML Metals Corp. v. First Union Rail Corp., k/n/a Wells Fargo Rail Corp. (the "First Lawsuit"), Case No. 2:15-cv-00152-JNP-DBP, United States District Court, District of Utah, at Doc. Nos. 38, 80-81.) Specifically, the Wells Fargo Defendants assert that CML Metals fraudulently transferred its assets to Black Iron pursuant to the APA. (Id.) These claims have been pending since August 19, 2015. (Id.)

14. Black Iron's causes of action in this Complaint are compulsory counterclaims that should have been filed in the First Lawsuit because they arise out of the same transaction or occurrence. For a claim to be compulsory, the claim must "arise[] out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(a). The Tenth Circuit follows a "flexible and realistic" approach to the transaction or occurrence requirement:

> Rather than attempting to define the key terms of Rule 13(a), most courts . . . have preferred to suggest standards by which the compulsory or permissive nature of specific counterclaims may be determined . . . by posing four questions: (1) Are the issues of fact and law raised by the claim and counterclaim largely the same? (2) Would res judicata bar a subsequent suit on defendants' claim absent the compulsory counterclaim rule? (3) Will substantially the same evidence support or refute plaintiffs' claim as well as defendants' counterclaim? and (4) Is there any logical relation between the claim and counterclaim? Of these questions . . . the 'logical relation' test is the most controlling.

United States v. Questar Gas Mgmt. Co., No. 2:08-cv-167-DAK, 2010 WL 2813779, at *2 (D. Utah July 16, 2010) (internal quotations and citations omitted).

15. Here, there is a logical relation between the Wells Fargo Defendants' fraudulent transfer claims and Black Iron's storage costs claims. The fraudulent transfer claims center on the transfer of CML Metal's assets to Black Iron through the APA. The transferred assets

6

24618653

include the land and railroad tracks at issue in Black Iron's claims. Essentially, the Wells Fargo Defendants claim that Black Iron is not entitled to certain assets (including land on which the railroad tracks are located) and Black Iron now claims damages arising out of its purchase of those very same assets. This relationship is strengthened by the fact that Black Iron appears to calculate the alleged "storage" costs as beginning to accrue on June 1, 2015 – a little more than a month after Black Iron acquired the assets at issue from CML Metals.

## Amount in Controversy

16.    The amount in controversy in this matter exceeds $75,000, exclusive of interest and costs. Pursuant to the Complaint, Black Iron seeks a judgment in the amount of $17,391,000.00 for storage costs, prejudgment interest in the amount of $913,452.71, and incidental and consequential damages in the amount of $10,000,000.00. (See Compl. at Prayer for Relief.)

17.    As a result, this is a civil action of which this Court has original jurisdiction pursuant to 28 U.S.C. § 1332, and is one which may be removed to this Court by the Wells Fargo Defendants pursuant to the provisions of 28 U.S.C. § 1441 in that it is a civil action between citizens of different States and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

## Filing and Service

18.    A copy of this Notice of Removal and related documents is being served this day by mail and electronic filing on Plaintiff.

19.    Pursuant to 28 U.S.C. § 1446, counsel for the Wells Fargo Defendants have caused a copy of a Notice of Removal to be filed with the Clerk of the Fifth Judicial District Court of the State of Utah, Iron County.

20.    Also filed concurrently herewith is an Appendix containing copies of all pleadings in the State Court Action. This Appendix is attached hereto as "Exhibit C –

7

24618653

Appendix."

WHEREFORE, the Wells Fargo Defendants respectfully requests that this Notice of Removal be filed, the State Court Action be removed to and proceed hereafter in this Court, and no further proceedings be had in the Fifth Judicial District Court of the State of Utah.

DATED this 11th day of August, 2016.

SNELL & WILMER L.L.P.


/s/ Douglas P. Farr
Amy F. Sorenson
Douglas P. Farr

*Attorneys for Defendants Helm Pacific*
*a.k.a. Helm Pacific Leasing, and First*
*Union Rail Corporation d/b/a Wells Fargo Rail*

8

24618653

## CERTIFICATE OF SERVICE

I certify that on this 11th day of August, 2016, a true and correct copy of the foregoing

NOTICE OF REMOVAL OF ACTION TO U.S. DISTRICT COURT sent via first-class mail, to

the following:

Dana T. Farmer, Thomas W. Farrell, Ken Brown, SMITH KNOWLES, P.C., 2225 Washington Blvd., Suite 200, Ogden, UT 8440 l

Cyndi W. Gilbert
P.O. Box 190
1091 South Toquerville Blvd.
Toquerville, UT 84774

/s/ *Douglas P. Farr*

9

24618653

# EXHIBIT A

Dana T. Farmer (8371)
Thomas W. Farrell (13697)
Ken Brown (15554)
**SMITH KNOWLES, P.C.**
2225 Washington Blvd., Suite 200
Ogden, UT 84401
Telephone:(801) 476-0303
Facsimile:(801) 476-0399
Email: dfarmer@smithknowles.com

Cyndi W. Gilbert (4513)
cwg@infowest.com
P.O. Box 190
1091 South Toquerville Blvd.
Toquerville, UT 84774

*Attorneys for Plaintiffs*

---

## IN THE FIFTH JUDICIAL DISTRICT COURT OF IRON COUNTY

## CEDAR CITY DEPARTMENT, STATE OF UTAH

| | |
|---|---|
| BLACK IRON, LLC, a Utah limited liability company;<br><br>Plaintiff,<br><br>vs.<br><br>HELM PACIFIC aka HELM PACIFIC LEASING, a Nebraska general partnership; FIRST UNION RAIL CORPORATION d/b/a WELLS FARGO RAIL, a North Carolina corporation; CML HOLDINGS, a Delaware corporation; CML METALS CORPORATION, a corporation; MICHAEL W. CONBOY, an individual, DOES 1-15; and ROES 1-15,<br><br>Defendants. | **COMPLAINT**<br>Tier 3<br><br>Civil No. _160500102_<br><br>Judge ___Ketih C. Barnes___<br><br>**(JURY DEMAND)** |

PLAINTIFF, Black Iron, LLC, now appearing through counsel, Dana T. Farmer, Thomas

W. Farrell, and Ken Brown of the law firm of Smith Knowles, P.C., and Cyndi Gilbert; and

1

hereby complains and alleges as follows:

## PARTIES

1.      Plaintiff, BLACK IRON, LLC ("Black Iron") is a Utah limited liability company with its principal place of business located in Iron County, State of Utah.

2.      Upon information and belief, HELM PACIFIC aka HELM-PACIFIC LEASING ("Helm") is a Nebraska general partnership with its principal place of business located in Cook County, State of Illinois.

3.      Upon information and belief, FIRST UNION RAIL CORPORATION d/b/a WELLS FARGO RAIL ("First Union"), is a North Carolina corporation with its principal place of business located in Cook County, State of Illinois.

4.      Upon information and belief, CML HOLDINGS, INC. is a Delaware corporation with its principal place of business located in Washington County, State of Utah

5.      CML METALS CORPORATION is a Utah corporation with its principal place of business located in Washington County, State of Utah.  CML Metals Corporation and CML Holdings, Inc. are collectively referred to herein as "CML".

6.      MICHAEL CONBOY ("Conboy") is an individual residing in the State of New York.

7.      Defendants Does 1-15 are legal entities or individuals who are unknown to Plaintiff at this time but who may claim some interest in the railcars subject to this action and who become known through discovery.

8.      Defendants Roes 1-15 are legal entities or individuals who are officers, directors, successors, or assigns of CML who are unknown to Plaintiff at this time, but who may become

2

known through discovery.

## JURISDICTION AND VENUE

9.    Jurisdiction is appropriate in this Court pursuant to Utah Code Ann. § 78A-5-102(1) and venue is appropriate pursuant to Utah Code Ann. § 78B-3-301 & 307.

## GENERAL ALLEGATIONS

### *Helm leases railcars and locomotives to CML*

10.    Helm entered in to three (3) separate net lease agreements with CML for the rental of more than 540 open hopper railcars.

11.    Helm also leased four locomotives to CML.

12.    The railcars and locomotives were leased for CML to load and transport iron ore from its mine located at Iron Mountain in Iron County, State of Utah, to various ports on the west coast.

13.    On March 10, 2015, CML commenced litigation against Helm and First Union in the case styled: *CML Metal Corporation v. First Union Rail Corporation, Civil No. 2:15-cv-00152-JNP-DBP, United State District Court for the District of Utah* ("Federal Case").

14.    In the Federal Case CML claims the railcars were unfit for its operation because they were designed to transport products other than iron ore and unable to hold and haul amounts required to be shipped by CML.

### *Black Iron acquires the assets of CML*

15.    On April 29, 2015, CML and Black Iron entered into an Asset Purchase Agreement ("Asset Purchase Agreement"), whereby Black Iron acquired certain assets of CML.

16.    The purchase closed on or about May 6, 2015.

17.    On August 19, 2015, First Union filed a Third Party Complaint against Black Iron in the Federal Case seeking to set aside the Asset Purchase Agreement and have the assets Black Iron purchased from CML sold to pay any judgment First Union may obtain in the Federal Case.

18.    Because of the cloud created by the claim against Black Iron in the Federal Case, Black Iron's ability to enter any long term agreements for mining operations is severely impaired.

### Black Iron secures mine and railcars, First Union promises to remove railcars

19.    On May 8, 2015, Steve Gilbert, the manager of Black Iron; and Bobby Brown, attorney for First Union; spoke by telephone.

20.    During the May 8, 2015, telephone call, Steve Gilbert told attorney Brown that Black Iron had acquired assets from CML and the acquired assets included the mine and the tracks where First Union's railcars and locomotives were located.

21.    During the May 8, 2015, telephone conversation, Steve Gilbert asked attorney Brown to have First Union remove the railcars and locomotives by June 1, 2015.

22.    Steve Gilbert told attorney Brown that if the railcars and locomotives were not removed by June 1, 2015, First Union would have to pay rent to store the cars and locomotives on Black Iron's tracks.

23.    First Union agreed to have the cars and locomotives out by June 1, 2015.

24.    As soon as Black Iron took ownership of the mine, track, and other assets, it provided security and safekeeping of the railcars and locomotives.

25.    Black Iron continues to provide security and safekeeping of the railcars and locomotives.

4

*First Union fails to remove the railcars*

26.     First Union did not have employees or independent contractors inspect the railcars and locomotives until the week of June 2, 2015.

27.     During the inspection, First Union had Black Iron's security personnel assist in starting the locomotives by transferring water to them to inspect and ready them to move.

28.     On June 9, 2015, in response to requests from Black Iron for updates concerning inspection and removal of the railcars and locomotives, First Union confirmed it inspected all railcars and locomotives; that three of the four locomotives were serviceable; and that it would like to move them as soon as practicable.

29.     On June 17, 2015, Black Iron received an email from First Union indicating that First Union had venders in place to start railcar repairs.

30.     On June 19, 2015, Melissa Meier ("Melissa"), Sr. Business Manager for Union Pacific Railroad ("UPRR"), advised Black Iron that UPRR wanted a track inspection performed by a UPRR track inspector.

31.     The following month, on July 9, 2015, Melissa told Black Iron that First Union contacted UPRR with a request to move the railcars and locomotives as soon as possible, yet they failed to move them.

32.     A week later, on July 15, 2015, First Union sent an email to Black Iron explaining that First Union was working on an agreement with UPRR to move the railcars and locomotives.

33.     Then, on August 8, 2015, First Union told Black Iron it had a vendor coming the next week to repair the railcars.

34.     On August 20, 2015, UPRR inspected the tracks.

5

35. Since First Union told Black Iron that UPRR would be removing the locomotives and railcars, Black Iron sent an email to Melissa on September 21, 2015, reminding her that the cars could be repaired and removed.

36. On September 24, 2015, First Union's employees or independent contractors came to the mine to winterize the four locomotives, rather than repairing or removing the locomotives and railcars.

37. In the 337 days from August 8, 2015, to July 10, 2016, with the exception of winterizing the locomotives, no First Union vendor or employee repaired the railcars or locomotives or prepared them for removal.

38. On October 29, 2016, Black Iron emailed Melissa again to come and get the railcars and locomotives.

39. On November 10, 2015, Black Iron received an email from Mark Gallegos with the Federal Railroad Administration which contained a list of findings on UPRR's track inspection.

40. On January 8, 2016, Black Iron received an email from Melissa saying UPRR was still working with First Union to move the railcars.

41. On February 26, 2016, Melissa forwarded a message to Black Iron from First Union indicating there were no updates on movement.

42. On or about April 4, 2016, Black Iron again reminded UPRR that First Union's vendors could come on site.

43. Although UPRR indicated that it was working with First Union to move the locomotives and railcars, First Union did not need permission to move the locomotives and

railcars on UPRR tracks, as long as they did not exceed 10 mph.

44.    Similarly, First Union could have moved the cars by truck.

### First Union files a false and speculative lawsuit against Black Iron in Federal Court

45.    Although Black Iron worked with First Union in good faith since it closed the asset purchase; from May to August 2015, unbeknownst to Black Iron, First Union was plotting to set aside the sale of CML's assets to Black Iron.

46.    During this time (May to August 2015), Steve Gilbert and attorney Brown had telephone conversations when Steve Gilbert was not represented by counsel and answered questions about the asset purchase and Black Iron's ownership of the assets.

47.    Rather than working in good faith to move the cars, First Union focused its attention on litigation against Black Iron.

48.    On August 18, 2015, when it became aware the Federal Case was going to be filed, Black Iron notified First Union to cease and desist from entering its property or making any additional efforts to remove the cars and locomotives until Black Iron had further assurance who owned the cars and had authority to repair or remove the cars.

49.    Moreover, since the locomotives and railcars were at the mine, Black Iron needed to be confident that First Union's employees or contractors could properly operate under federal safety guidelines.

50.    On August 19, 2015, First Union filed a Third Party Complaint against Black Iron in the Federal Case.

### First Union prevents Black Iron form leasing or using its tracks

51.    Due to the presence of First Union's locomotives and railcars, Black Iron has

been prevented from storing other railcars on its track or moving iron from its mine.

52.    As a most recent example, on April 18, 2016, Black Iron received an email from Melissa stating that she had customers reaching out to her wanting to lease Black Iron's track.

53.    According to UPRR's published rates for storing empty railcars, the reasonable rate prior to April 1, 2016, was $70/day; and as of April 1, 2016, is $100/day. (**Exhibit "A"**)

## FIRST CAUSE OF ACTION
(Trespass– Helm & First Union)

54.    Black Iron incorporates and alleges all prior paragraphs.

55.    The rail lines and the private property upon which First Union's cars and locomotives rest are owned by Black Iron.

56.    Black Iron provided First Union with a reasonable amount of time from the asset purchase closing to remove the railcars from Black Iron's tracks.

57.    First Union has not moved the railcars.

58.    First Union did not provide documentation to Black Iron confirming its ownership of the lease between CML and Helm, nor has First Union provided other evidence demonstrating its ownership of the railcars.

59.    Since the railcars remain on the tracks, they constitute a trespass for which Black Iron is entitled to damages.

60.    To the extent Helm retains any ownership interest or control over the railcars or locomotives, it is complicit and jointly liable with First Union.

WHEREFORE, for the trespass by First Union and Helm, Black Iron seeks relief from this Court as follows:

8

A.   Judgment in the amount of $17,391,000.00 as of July 8, 2016, and continuing thereafter at rate of $52,700.00 *per diem*;

B.   Prejudgment interest as allowed by Utah Code Ann. § 15-1-1 in the amount of $913,452.21 as of July 8, 2016, and continuing to accrue thereafter at the rate of $4,511.99 *per diem*;

C.   Incidental and consequential damages of $10,000,000.00;

D.   Prejudgment attorney fees and all costs of court as allowed by contract and by law;

E.   Post-judgment interest Utah Code Ann. § 15-1-1;

F.   Post-judgment attorney fees and all costs of court as allowed contract and law; and

G.   For such additional relief as the Court may deem just and proper.

**SECOND CAUSE OF ACTION**
(Breach of Contract – Helm & First Union)

61.   Black Iron hereby realleges and incorporates by reference all paragraphs hereinabove, as though specifically set forth herein.

62.   When Black Iron advised First Union that storage would be charged if the cars and locomotives were not moved by June 1, 2015, and First Union undertook to: 1) inspect the cars and locomotives, and 2) engage UPRR to assist with removal, it agreed to pay storage fees if the removal was not complete by June 1, 2015.

63.   As of the filing of this Complaint the railcars and locomotives remain on Black Iron's tracks.

9

64.     The presence of the railcars and locomotives on Black Iron's tracks is preventing Black Iron from storing other railcars or operating its mine or otherwise utilizing its privately owned tracks.

65.     To the extent Helm retains an ownership interest or control over the railcars or locomotives it is complicit and jointly liable with First Union.

WHEREFORE, Black Iron prays for relief and judgment from this Court as follows:

A.      Judgment in the amount of $17,391,000.00 as of July 8, 2016, and continuing thereafter at rate of $52,700.00 *per diem*;

B.      Prejudgment interest as allowed by Utah Code Ann. § 15-1-1 in the amount of $913,452.71 as of July 8, 2016 and continuing to accrue thereafter at the rate of $4,511.99 *per diem*;

C.      Incidental and consequential damages of $10,000,000.00;

D.      Prejudgment attorney fees and all costs of court as allowed by contract and by law;

E.      Post-judgment interest Utah Code Ann. § 15-1-1;

F.      Post-judgment attorney fees and all costs of court as allowed contract and by law; and

G.      For such additional relief as the Court may deem just and proper.

## THIRD CAUSE OF ACTION
(Contract Implied in Fact – Helm & First Union)

66.     Black Iron hereby realleges and incorporates by reference all paragraphs hereinabove, as though specifically set forth herein.

10

67.     First Union requested that Black Iron allow First Union to keep the railcars and locomotives on Black Iron's tracks until they could be removed.

68.     If the railcars and locomotives were not removed by June 1, 2015 Black Iron expected First Union would pay storage fees.

69.     From the May 8, 2015 phone call First Union knew Black Iron expected to be paid if the railcars and locomotives were not removed.

70.     To the extent Helm retains an ownership interest or control over the railcars or locomotives it is complicit and jointly liable with First Union.

WHEREFORE, Black Iron prays for relief and judgment from this Court as follows:

A.     Judgment in the amount of $17,391,000.00.00 as of July 8, 2016, and continuing thereafter at rate of $52,700.00 *per diem*;

B.     Prejudgment interest as allowed by Utah Code Ann. § 15-1-1 in the amount of $913,452.71 as of July 8, 2016 and continuing to accrue thereafter at the rate of $4,511.99 *per diem*;

C.     Incidental and consequential damages of $10,000,000.00;

D.     Prejudgment attorney fees and all costs of court as allowed by contract and by law;

E.     Post-judgment interest Utah Code Ann. § 15-1-1;

F.     Post-judgment attorney fees and all costs of court as allowed contract and by law; and

G.     For such additional relief as the Court may deem just and proper.

## FOURTH CAUSE OF ACTION
(Unjust Enrichment – Helm & First Union)

71.    Black Iron hereby realleges and incorporates by reference all paragraphs hereinabove, as though specifically set forth herein.

72.    After First Union failed to remove the railcars from Black Iron's tracks, it received the benefit of being able to store its railcars on Black Iron's tracks without paying any storage fees.

73.    Throughout multiple communications between Black Iron and First Union discussing the presence of the railcars, the need to move the railcars, and First Union's lack of diligence in removing the railcars, it is evident that First Union had knowledge and appreciation that its railcars were on privately-owned tracks for which it was receiving a benefit.

74.    As of May 6, 2015, Black Iron owned the tracks and conferred the benefit on First Union.

75.    On February 24, 2016, First Union's president, Barbara Wilson; stated:

Rail equipment demand in the aggregate tends to follow railcar loadings in the aggregate, and 2016 is off to a soft start for both. Crude oil and sand shipment volumes are down meaningfully due to weakness in the energy space, and coal volumes remain depressed due to numerous new regulations combined with mild weather. (**Exhibit "B"**).

76.    Currently, the depression in the coal industry has diminished the demand for open-top hopper cars of the type which First Union is storing on Black Iron's tracks. Thus, were it not for the presence of the railcars on these tracks, First Union would be paying to store the railcars and locomotives elsewhere.

77.    Since the mass storage of railcars for coal products has consumed a substantial

12

amount of available storage space, and since it is difficult to find places to store the railcars, First Union has allowed the railcars to remain on Black Iron's tracks and derived the storage benefit of that, which is unjust and inequitable.

78.   To the extent Helm retains an ownership interest or control over the railcars or locomotives, it is complicit and jointly liable with First Union.

WHEREFORE, Black Iron prays for relief and judgment from this Court as follows:

A.   Judgment in the amount of $17,391,000.00 as of July 8, 2016, and continuing thereafter at rate of $52,700.00 *per diem*;

B.   Prejudgment interest as allowed by Utah Code Ann. § 15-1-1 in the amount of $913,452.71 as of July 8, 2016 and continuing to accrue thereafter at the rate of $4,511.99 *per diem*;

C.   Incidental and consequential damages in an amount to be proven at trial but not less than $10,000,000.00;

D.   Prejudgment attorney fees and all costs of court as allowed by contract and by law;

E.   Post-judgment interest Utah Code Ann. § 15-1-1;

F.   Post-judgment attorney fees and all costs of court as allowed contract and by law; and

G.   For such additional relief as the Court may deem just and proper.

### FIFTH CAUSE OF ACTION
(Warehouse Lien – Helm, First Union & DOES 1-15)

79.   Black Iron incorporates and alleges all prior paragraphs.

80. Since closing the asset purchase, Black Iron has been warehousing the railcars and locomotives by providing safekeeping and providing security.

81. Black Iron agreed to store First Union's railcars and locomotives on its tracks without charge only until June 1, 2015.

82. Upon information and belief DOES 1-15 are individual or organizations who may have some interest in the railcars or locomotives and such interest is inferior and subject to Black Iron's possessory lien.

WHEREFORE, Black Iron prays for relief and judgment from this Court as follows:

A. An order foreclosing the interests of First Union, HELM, CML and Does 1-15 in the locomotives and ordering the Sheriff of Iron County to sell the railcars and equipment collectively or individually in satisfaction of the debt as set for the below, and to pay all costs of sale from the proceeds and to Black Iron:

B. Judgment in the amount of $17,391,000.00 as of July 8, 2016, and continuing thereafter at rate of $52,700.00 *per diem*;

C. Prejudgment interest as allowed by Utah Code Ann. § 15-1-1 in the amount of $913,452.71 as of July 8, 2016, and continuing to accrue thereafter at the rate of $4,511.99 *per diem*;

D. Incidental and consequential damages of $10,000,000.00;

E. Prejudgment attorney fees and all costs of court as allowed by contract and by law;

F. Post-judgment interest Utah Code Ann. § 15-1-1;

G. Post-judgment attorney fees and all costs of court as allowed contract and by law;

14

and

H.     For such additional relief as the Court may deem just and proper.

## SIXTH CAUSE OF ACTION
(Promissory Estoppel/Indemnity – Conboy, CML & ROES 1-15)

83.     Black Iron incorporates and alleges all prior paragraphs.

84.     On April 2, 2015, Black Iron executed a note in favor of Conboy ("Note").

85.     The amount of the Note is $2,902,900.06.

86.     Black Iron executed the Note and the Asset Purchases Agreement in reliance on the promise from CML to indemnify Black Iron by retaining claims between CML and First Union.

87.     Before and after execution of the Asset Purchase Agreement and the Note, Conboy promised to retain claims and indemnify Black Iron from liability, charges, costs, expenses, or losses associated with First Union and the railroad.

88.     Upon information and belief, when Conboy made his promises to Black Iron, he may have been acting individually or on behalf of CML and/or the instance of its officers and directors.

89.     Conboy, CML and ROES 1-15 are equitably bound to resolve all matters relating to the storage and removal of the railcars and locomotives.

90.     Black Iron has expended money for security and safekeeping of the railcars.

91.     Black Iron is also incurring expenses to proceed with this action to have the railcars and locomotives removed.

92.     Despite demands from Black Iron, Conboy; CML; and ROES 1-15 have failed to

15

fulfill their obligations to Black Iron.

93.     Since CML and First Union are in litigation and Black Iron is suffering losses, as a result of First Union's railcars and locomotives being stored on Black Iron's tracks, Black Iron is suffering damages because it is not receiving storage payments from First Union and cannot operate the mine, use its tracks, or otherwise conduct business.

WHEREFORE, Black Iron prays for relief and judgment against Conboy as follows:

A.     Judgment in the amount of $17,391,000.00 as of July 8, 2016, and continuing thereafter at rate of $52,700.00 *per diem*;

B.     Prejudgment interest as allowed by Utah Code Ann. § 15-1-1 in the amount of $913,452.71 as of July 8, 2016 and continuing to accrue thereafter at the rate of $4,511.99 *per diem*.

C.     Incidental and consequential damages in an amount to be proven at trial but not less than $10,000,000.00

D.     Prejudgment attorney fees and all costs of court as allowed by contract and by law;

E.     Post-judgment interest Utah Code Ann. § 15-1-1;

F.     Post-judgment attorney fees and all costs of court as allowed contract and by law;

If Conboy was acting in whole or in part on behalf of other individuals, Black Iron seeks judgment jointly and severally against Roes 1-15 as follows:

G.     Judgment in the amount of $17,391,000.00 as of July 8, 2016, and continuing thereafter at rate of $52,700.00 *per diem*;

H.     Prejudgment interest as allowed by Utah Code Ann. § 15-1-1 in the amount of

$913,452.71 as of July 8, 2016 and continuing to accrue thereafter at the rate of $4,511.99 *per diem.*

I.     Incidental and consequential damages in an amount to be proven at trial but not less than $10,000,000.00;

J.     Prejudgment attorney fees and all costs of court as allowed by contract and by law;

K.     Post-judgment interest Utah Code Ann. § 15-1-1;

L.     Post-judgment attorney fees and all costs of court as allowed contract and by law;

Moreover if Conboy was acting in whole or in part on behalf of CML, Black Iron seeks judgment jointly and severally against CML as follows:

M.     Judgment in the amount of $17,391,000.00 as of July 8, 2016, and continuing thereafter at rate of $52,700.00 *per diem;*

N.     Prejudgment interest as allowed by Utah Code Ann. § 15-1-1 in the amount of $913,452.71 as of July 8, 2016 and continuing to accrue thereafter at the rate of $4,511.99 *per diem.*

O.     Incidental and consequential damages in an amount to be proven at trial, but not less than $10,000,000.00;

P.     Prejudgment attorney fees and all costs of court as allowed by contract and by law;

Q.     Post-judgment interest Utah Code Ann. § 15-1-1;

R.     Post-judgment attorney fees and all costs of court as allowed contract and by law; and

17

S.      For such additional relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(a) Utah R. Civ. P. Black Iron hereby respectfully and formally requests

this matter be heard and adjudicated by a jury.

DATED: this 12th day of July, 2016

SMITH KNOWLES, P.C.

/s/ Dana T. Farmer

_____

Dana T. Farmer
Thomas W. Farrell
Ken Brown
*Attorneys for Plaintiff, Black Iron, LLC*

Filed for:
Black Iron, LLC
6249 West Gilbert Industrial Court
Hurricane, Utah 84737

18

 BUILDING AMERICA*

# Demurrage and Storage Policy Changes Effective April 1, 2016

**Announcement Number:** CN2016-1
**Categories:** General Announcements
**Posted Date:** January 4, 2016

To Our Customers,

In an effort to improve network fluidity, bolster capacity and improve equipment utilization, Union Pacific Railroad will be modifying its General Demurrage and Private Empty Car Storage Rules & Charges Policy, effective April 1, 2016.

Union Pacific is focused on reducing excessive rail car dwell on our tracks and in our terminals. While volume is variable from year to year, rail cars holding in our yards is not. This new approach is designed to address this issue by differentiating hold charges between yard and industry tracks. Fluid rail yards support Union Pacific's mission to deliver safe and reliable service to all of our customers.

**Under the new plan,** debits will be issued based on the consumption of both railroad controlled equipment and yard capacity. Debits issued for cars on spot will not change from the current program. To this effect, railroad controlled cars held at industry will continue to be billed a debit of $100 per day, refrigerated cars at a debit of $200 per day, while private cars at industry will remain non-chargeable.

The changes apply to cars that are **held on Union Pacific yard tracks** and are as follows:

› Non-hazardous railroad controlled cars will increase by $100 per day, bringing the daily debit to $200 per day.
› Refrigerated cars will increase by $100 per day, bringing the daily debit to $300 per day.
› Private loads will continue to have debits accrue at $100 per day. Given their private ownership, these cars are only charged for consuming yard capacity.
› Private Empty Car Storage (PECS) rates will increase from $70 per day to $100 per day.
› Hazardous car debits will remain at $250 per day.
› Capacity credits will be issued at the new yard debit rate in consideration of service days or failed service events.

Additional information on your estimated impact will be made available to your Union Pacific representative. Please contact your representative with questions and to discuss throughput improvement ideas so that any changes can be implemented in advance of the new policy.

We value your business and want to provide the best service product possible. Please contact your Union Pacific representative with any questions.



**EXHIBIT**

"A"

7/9/2016

BUILDING AMERICA®

# Private Empty Car Storage

## Storage Charges

- Receiver of the empty rail car will be assessed the charges for all Net Chargeable Storage Days for all empty private equipment.
- Charges will be assessed to all Industrial Products, Agricultural and Chemicals customers.
- Net Chargeable Storage Days equals total debits less credits earned.
- The current storage fee is $100 per Net Chargeable Storage Day.

> Storage Policy Changes Effective April 1, 2016
> [http://www.up.com/customers/announcements/custc 1.html]

## Debits

- One (1) debit will be assessed for every full or partial day that a private empty car is in hold status on the Union Pacific network, commencing on the first 12:00 a.m. after the equipment has been placed in hold status.
- Debits will be assessed at any origin, destination, or intermediate holding location.
- Debits will be issued to the Receiver location of the empty rail car.
- Debits will not be assessed for empty private equipment on private track.
- On the first 12:00 a.m. after equipment has been released from hold status, debits will cease to accrue.
- Debits will not accrue if cars remain in released hold status.

## Credits

Credits are issued to the Receiver of the empty rail car. There are three methods of earning credits:

- Actually Placed (AP) Credits: One (1) credit will be issued for each private empty rail car on the day it is actually placed at destination industry.
- Placement Credits: If an Order-in customer orders a specific private empty rail car via the Web or Interactive Voice Recognition (IVR), which has arrived in the customer's serving area, but UP does not deliver the car, or delivers an alternative car, two (2) credits per rail car will be issued for each rail car requested but not actually placed. Placement Credits will only be given if the private empty rail car released returns to a hold status instead of being placed at the customer's facility (actually placed). Once the car returns to hold status, the credits will be applied. Cars which are not delivered and stay in a release from hold status will not receive placement credits nor will they receive debits.
- Capacity Credits: When a Spot-on Arrival customer has available capacity and UP does not bring in a car(s) to fill that capacity, two (2) credits will be issued for each private empty rail car in the serving area up to the customer's maximum available capacity.

## Billing

- Bills will be issued monthly for the prior calendar month's inventory.
- If credits exceed debits, no storage bill will be generated.
- Credits are only valid in the month they are earned and will not be carried over to subsequent months.

PECS is part of the Accessorial Management Application (AMA). AMA provides activity from the current month, along with a link to outstanding bills from previous months. Customers have the ability to dispute in the current month, prior to the bill being issued.

Post-bill general disputes can be handled using Account on the Web (AOW). To use the AOW functionality, customers must be registered with AOW and have a MyUPRR user ID.

## Additional Resources - FAQ

- Read PECS Frequently Asked Questions    for additional information.

This information is provided for the convenience of our customers. This document is a representation of Union Pacific Accessorial Tariff UP 6004. In the event of a conflict, actual published Union Pacific Accessorial Tariff UP 6004 will apply. A copy will be available upon request. To subscribe to this tariff, contact the eBusiness Team at 800-872-1045.

Wednesday, February 24, 2016

EXHIBIT

"B"

# Rail equipment market: "Slow and steady growth, positive and healthy"

Written by David Nahass, Financial Editor



Wells Fargo Rail President Barbara Wilson

As many readers of the "Financial Edge" know, the end of 2015 saw the purchase of General Electric Railcar Services, one of the largest and in some ways oldest of the operating lessor companies that lease railcars to their customers on primarily shorter (think seven years and less) lease terms.

Wells Fargo Rail (formerly First Union Rail) purchased the majority of the cars and locomotives, and Union Tank Car Company (a unit of Warren Buffet's Berkshire Hathaway) purchased the tank railcars and railcar repair shops. This is a dramatic change in the railcar leasing marketplace.

I had a chance to sit down with Wells Fargo Rail President Barbara Wilson and ask her about the acquisition, the outlook for the company and how she views today's railcar leasing market.

Financial Edge: Post-GE acquisition, what's the size of WFR?

Barbara Wilson: We were delighted to close on the acquisition of GE Railcar Services on Jan. 1, 2016. This acquisition allowed us to expand our available fleet of rail equipment by more than 77,000 railcars and 1,000 locomotives. In addition, on that date we rebranded the company to Wells Fargo Rail. We are very proud to take on our parent company name. Our fleet of equipment available for lease now totals more than 174,000 railcars and 1,800 locomotives. That fleet is very diversified, but heavily focused on freight cars. At this time we own fewer than 10,000 tank cars but look forward to growing that portion of our fleet to continue to support the needs of our customers. In addition, we manage more than 20,000 railcars on operating leases for other owners.

FE: To which market segments do you feel is WFR particularly exposed right now? Is that exposure something that immediately begins to require active management, or as a result of the overall scale of WFR do individual market segments not move the needle in the way they used to in the past?

BW: Our present railcar fleet diversification largely mirrors the diversification of the North American railcar fleet. Therefore we do have meaningful exposure to coal, sand, grain and centerbeams. As you know, the strong U.S. dollar has negatively impacted virtually all commodities that get exported. We see weakness in the volumes of those commodities (steel, scrap, grain etc.) and therefore reduced demand for railcars to move those commodities. We have a very small tank car fleet, and our Packing Group 3 tank car fleet consists of fewer than 2,500 cars, so our exposure to the new tank car design regulations is very limited. Our locomotive operating lease fleet consists primarily of high quality four-axle road and switcher units. Presently there is some weakness in demand for those units due to the decrease in rail freight volumes.

FE: In what markets does WFR maintain limited exposure? Do those markets, now in retrospect, offer you vindication vs. the peer (or previously peer) group that is also working to grow?

BW: We are clearly underweighted in tank cars. That is because we entered that market late and were very selective in the equipment we acquired. Prior to July 2013 no one saw the significant new equipment specifications coming for flammable liquid tanks, so our position is somewhat a result of luck, not planning. Today we see the tank car market as very attractive to invest in. We hope to expand our customer base through investment in the tank car market and are committed to supporting the needs of our existing customers through investment in the tank cars that they require.

FE: GE had made market noise for years about selling its operating lease fleet, and throughout your career you had participated in a number of evaluations of that fleet. What made the final push successful this time around?

BW: We were fortunate that in April 2015 the management and board of directors at GE corporate decided to exit the financial services business and focus on industrial technology businesses. The GE Rail business was put up for sale as a result of that decision, not due to specific qualities of the GE Rail business. Once we saw the detail and the quality of the GE Rail fleet, we knew it would be a very complementary and accretive acquisition for our business. Most important, we believe that our acquisition of the fleet allows us to better serve our customers. With a significantly larger inventory of assets, we are much better positioned to have the railcars and locomotives needed by our customers, allowing us to be a better strategic partner to them.

FE: Are there risks in a relationship business of being too big?

BW: The breadth of our fleet means that we serve many different customers in many different businesses. The Wells Fargo vision is, "We want to satisfy our customers' financial needs and help them succeed financially." In the rail operating lease business, that requires us to have the assets that our customers need to operate their business. Wells Fargo has committed a large amount of capital to the rail operating lease business with the goal of better serving the needs of our customers. We believe customers in our all business segments can be better served, and save time and money, if they bring their rail equipment needs to one trusted provider that knows them well, provides reliable guidance and advice, and can serve their full range of equipment needs through a wide choice of products and services. That is why we have made billions of dollars of investments in all railcar types, why we have a fleet of locomotives available for lease, and why we provide management services to owners of railcar assets that need a hands-on, fully in-house staffed asset management partner.

FE: Will the market see some large offerings of excess product from the WFR to begin rebalancing the fleet or to reduce exposure to certain markets?

BW: As you can imagine, the integration of the GE Rail fleet into our legacy fleet will take some time. That integration requires that we fully understand the needs of our customers and analyze how our existing fleet aligns with those needs. Our company has not historically been a large seller in the secondary market because of the impact that selling has on our customer base. By the second half of this year we will be in a much better position to assess our fleet mix and answer the question on future asset sales.

# EXHIBIT B

# (Asset Purchase Agreement- Pending Filing Under Seal)

# EXHIBIT
# C

Dana T. Farmer (8371)
Thomas W. Farrell (13697)
Ken Brown (15554)
**SMITH KNOWLES, P.C.**
2225 Washington Blvd., Suite 200
Ogden, UT 84401
Telephone:(801) 476-0303
Facsimile:(801) 476-0399
Email: dfarmer@smithknowles.com

Cyndi W. Gilbert (4513)
cwg@infowest.com
P.O. Box 190
1091 South Toquerville Blvd.
Toquerville, UT 84774

*Attorneys for Plaintiffs*

## IN THE FIFTH JUDICIAL DISTRICT COURT OF IRON COUNTY

## CEDAR CITY DEPARTMENT, STATE OF UTAH

| | |
|---|---|
| BLACK IRON, LLC, a Utah limited liability company;<br><br>Plaintiff,<br><br>vs.<br><br>HELM PACIFIC aka HELM PACIFIC LEASING, a Nebraska general partnership; FIRST UNION RAIL CORPORATION d/b/a WELLS FARGO RAIL, a North Carolina corporation; CML HOLDINGS, a Delaware corporation; CML METALS CORPORATION, a corporation; MICHAEL W. CONBOY, an individual, DOES 1-15; and ROES 1-15,<br><br>Defendants. | **COMPLAINT**<br>Tier 3<br><br>Civil No. __160500102__<br><br>Judge __Ketih C. Barnes__<br><br>**(JURY DEMAND)** |

PLAINTIFF, Black Iron, LLC, now appearing through counsel, Dana T. Farmer, Thomas

W. Farrell, and Ken Brown of the law firm of Smith Knowles, P.C., and Cyndi Gilbert; and

1

hereby complains and alleges as follows:

## PARTIES

1.     Plaintiff, BLACK IRON, LLC ("Black Iron") is a Utah limited liability company with its principal place of business located in Iron County, State of Utah.

2.     Upon information and belief, HELM PACIFIC aka HELM-PACIFIC LEASING ("Helm") is a Nebraska general partnership with its principal place of business located in Cook County, State of Illinois.

3.     Upon information and belief, FIRST UNION RAIL CORPORATION d/b/a WELLS FARGO RAIL ("First Union"), is a North Carolina corporation with its principal place of business located in Cook County, State of Illinois.

4.     Upon information and belief, CML HOLDINGS, INC. is a Delaware corporation with its principal place of business located in Washington County, State of Utah

5.     CML METALS CORPORATION is a Utah corporation with its principal place of business located in Washington County, State of Utah.  CML Metals Corporation and CML Holdings, Inc. are collectively referred to herein as "CML".

6.     MICHAEL CONBOY ("Conboy") is an individual residing in the State of New York.

7.     Defendants Does 1-15 are legal entities or individuals who are unknown to Plaintiff at this time but who may claim some interest in the railcars subject to this action and who become known through discovery.

8.     Defendants Roes 1-15 are legal entities or individuals who are officers, directors, successors, or assigns of CML who are unknown to Plaintiff at this time, but who may become

2

known through discovery.

## JURISDICTION AND VENUE

9.      Jurisdiction is appropriate in this Court pursuant to Utah Code Ann. § 78A-5-102(1) and venue is appropriate pursuant to Utah Code Ann. § 78B-3-301 & 307.

## GENERAL ALLEGATIONS

### *Helm leases railcars and locomotives to CML*

10.      Helm entered in to three (3) separate net lease agreements with CML for the rental of more than 540 open hopper railcars.

11.      Helm also leased four locomotives to CML.

12.      The railcars and locomotives were leased for CML to load and transport iron ore from its mine located at Iron Mountain in Iron County, State of Utah, to various ports on the west coast.

13.      On March 10, 2015, CML commenced litigation against Helm and First Union in the case styled: *CML Metal Corporation v. First Union Rail Corporation, Civil No. 2:15-cv-00152-JNP-DBP, United State District Court for the District of Utah* ("Federal Case").

14.      In the Federal Case CML claims the railcars were unfit for its operation because they were designed to transport products other than iron ore and unable to hold and haul amounts required to be shipped by CML.

### *Black Iron acquires the assets of CML*

15.      On April 29, 2015, CML and Black Iron entered into an Asset Purchase Agreement ("Asset Purchase Agreement"), whereby Black Iron acquired certain assets of CML.

16.      The purchase closed on or about May 6, 2015.

3

17.     On August 19, 2015, First Union filed a Third Party Complaint against Black Iron in the Federal Case seeking to set aside the Asset Purchase Agreement and have the assets Black Iron purchased from CML sold to pay any judgment First Union may obtain in the Federal Case.

18.     Because of the cloud created by the claim against Black Iron in the Federal Case, Black Iron's ability to enter any long term agreements for mining operations is severely impaired.

### *Black Iron secures mine and railcars, First Union promises to remove railcars*

19.     On May 8, 2015, Steve Gilbert, the manager of Black Iron; and Bobby Brown, attorney for First Union; spoke by telephone.

20.     During the May 8, 2015, telephone call, Steve Gilbert told attorney Brown that Black Iron had acquired assets from CML and the acquired assets included the mine and the tracks where First Union's railcars and locomotives were located.

21.     During the May 8, 2015, telephone conversation, Steve Gilbert asked attorney Brown to have First Union remove the railcars and locomotives by June 1, 2015.

22.     Steve Gilbert told attorney Brown that if the railcars and locomotives were not removed by June 1, 2015, First Union would have to pay rent to store the cars and locomotives on Black Iron's tracks.

23.     First Union agreed to have the cars and locomotives out by June 1, 2015.

24.     As soon as Black Iron took ownership of the mine, track, and other assets, it provided security and safekeeping of the railcars and locomotives.

25.     Black Iron continues to provide security and safekeeping of the railcars and locomotives.

4

### *First Union fails to remove the railcars*

26.   First Union did not have employees or independent contractors inspect the railcars and locomotives until the week of June 2, 2015.

27.   During the inspection, First Union had Black Iron's security personnel assist in starting the locomotives by transferring water to them to inspect and ready them to move.

28.   On June 9, 2015, in response to requests from Black Iron for updates concerning inspection and removal of the railcars and locomotives, First Union confirmed it inspected all railcars and locomotives; that three of the four locomotives were serviceable; and that it would like to move them as soon as practicable.

29.   On June 17, 2015, Black Iron received an email from First Union indicating that First Union had venders in place to start railcar repairs.

30.   On June 19, 2015, Melissa Meier ("Melissa"), Sr. Business Manager for Union Pacific Railroad ("UPRR"), advised Black Iron that UPRR wanted a track inspection performed by a UPRR track inspector.

31.   The following month, on July 9, 2015, Melissa told Black Iron that First Union contacted UPRR with a request to move the railcars and locomotives as soon as possible, yet they failed to move them.

32.   A week later, on July 15, 2015, First Union sent an email to Black Iron explaining that First Union was working on an agreement with UPRR to move the railcars and locomotives.

33.   Then, on August 8, 2015, First Union told Black Iron it had a vendor coming the next week to repair the railcars.

34.   On August 20, 2015, UPRR inspected the tracks.

5

35.     Since First Union told Black Iron that UPRR would be removing the locomotives and railcars, Black Iron sent an email to Melissa on September 21, 2015, reminding her that the cars could be repaired and removed.

36.     On September 24, 2015, First Union's employees or independent contractors came to the mine to winterize the four locomotives, rather than repairing or removing the locomotives and railcars.

37.     In the 337 days from August 8, 2015, to July 10, 2016, with the exception of winterizing the locomotives, no First Union vendor or employee repaired the railcars or locomotives or prepared them for removal.

38.     On October 29, 2016, Black Iron emailed Melissa again to come and get the railcars and locomotives.

39.     On November 10, 2015, Black Iron received an email from Mark Gallegos with the Federal Railroad Administration which contained a list of findings on UPRR's track inspection.

40.     On January 8, 2016, Black Iron received an email from Melissa saying UPRR was still working with First Union to move the railcars.

41.     On February 26, 2016, Melissa forwarded a message to Black Iron from First Union indicating there were no updates on movement.

42.     On or about April 4, 2016, Black Iron again reminded UPRR that First Union's vendors could come on site.

43.     Although UPRR indicated that it was working with First Union to move the locomotives and railcars, First Union did not need permission to move the locomotives and

6

railcars on UPRR tracks, as long as they did not exceed 10 mph.

44.     Similarly, First Union could have moved the cars by truck.

### First Union files a false and speculative lawsuit against Black Iron in Federal Court

45.     Although Black Iron worked with First Union in good faith since it closed the asset purchase; from May to August 2015, unbeknownst to Black Iron, First Union was plotting to set aside the sale of CML's assets to Black Iron.

46.     During this time (May to August 2015), Steve Gilbert and attorney Brown had telephone conversations when Steve Gilbert was not represented by counsel and answered questions about the asset purchase and Black Iron's ownership of the assets.

47.     Rather than working in good faith to move the cars, First Union focused its attention on litigation against Black Iron.

48.     On August 18, 2015, when it became aware the Federal Case was going to be filed, Black Iron notified First Union to cease and desist from entering its property or making any additional efforts to remove the cars and locomotives until Black Iron had further assurance who owned the cars and had authority to repair or remove the cars.

49.     Moreover, since the locomotives and railcars were at the mine, Black Iron needed to be confident that First Union's employees or contractors could properly operate under federal safety guidelines.

50.     On August 19, 2015, First Union filed a Third Party Complaint against Black Iron in the Federal Case.

### First Union prevents Black Iron form leasing or using its tracks

51.     Due to the presence of First Union's locomotives and railcars, Black Iron has

7

been prevented from storing other railcars on its track or moving iron from its mine.

52.    As a most recent example, on April 18, 2016, Black Iron received an email from Melissa stating that she had customers reaching out to her wanting to lease Black Iron's track.

53.    According to UPRR's published rates for storing empty railcars, the reasonable rate prior to April 1, 2016, was $70/day; and as of April 1, 2016, is $100/day. (**Exhibit "A"**)

**FIRST CAUSE OF ACTION**
(Trespass– Helm & First Union)

54.    Black Iron incorporates and alleges all prior paragraphs.

55.    The rail lines and the private property upon which First Union's cars and locomotives rest are owned by Black Iron.

56.    Black Iron provided First Union with a reasonable amount of time from the asset purchase closing to remove the railcars from Black Iron's tracks.

57.    First Union has not moved the railcars.

58.    First Union did not provide documentation to Black Iron confirming its ownership of the lease between CML and Helm, nor has First Union provided other evidence demonstrating its ownership of the railcars.

59.    Since the railcars remain on the tracks, they constitute a trespass for which Black Iron is entitled to damages.

60.    To the extent Helm retains any ownership interest or control over the railcars or locomotives, it is complicit and jointly liable with First Union.

WHEREFORE, for the trespass by First Union and Helm, Black Iron seeks relief from this Court as follows:

8

A.  Judgment in the amount of $17,391,000.00 as of July 8, 2016, and continuing thereafter at rate of $52,700.00 *per diem*;

B.  Prejudgment interest as allowed by Utah Code Ann. § 15-1-1 in the amount of $913,452.21 as of July 8, 2016, and continuing to accrue thereafter at the rate of $4,511.99 *per diem*;

C.  Incidental and consequential damages of $10,000,000.00;

D.  Prejudgment attorney fees and all costs of court as allowed by contract and by law;

E.  Post-judgment interest Utah Code Ann. § 15-1-1;

F.  Post-judgment attorney fees and all costs of court as allowed contract and law; and

G.  For such additional relief as the Court may deem just and proper.

## SECOND CAUSE OF ACTION
(Breach of Contract – Helm & First Union)

61.  Black Iron hereby realleges and incorporates by reference all paragraphs hereinabove, as though specifically set forth herein.

62.  When Black Iron advised First Union that storage would be charged if the cars and locomotives were not moved by June 1, 2015, and First Union undertook to: 1) inspect the cars and locomotives, and 2) engage UPRR to assist with removal, it agreed to pay storage fees if the removal was not complete by June 1, 2015.

63.  As of the filing of this Complaint the railcars and locomotives remain on Black Iron's tracks.

64.     The presence of the railcars and locomotives on Black Iron's tracks is preventing Black Iron from storing other railcars or operating its mine or otherwise utilizing its privately owned tracks.

65.     To the extent Helm retains an ownership interest or control over the railcars or locomotives it is complicit and jointly liable with First Union.

WHEREFORE, Black Iron prays for relief and judgment from this Court as follows:

A.     Judgment in the amount of $17,391,000.00 as of July 8, 2016, and continuing thereafter at rate of $52,700.00 *per diem*;

B.     Prejudgment interest as allowed by Utah Code Ann. § 15-1-1 in the amount of $913,452.71 as of July 8, 2016 and continuing to accrue thereafter at the rate of $4,511.99 *per diem*;

C.     Incidental and consequential damages of $10,000,000.00;

D.     Prejudgment attorney fees and all costs of court as allowed by contract and by law;

E.     Post-judgment interest Utah Code Ann. § 15-1-1;

F.     Post-judgment attorney fees and all costs of court as allowed contract and by law; and

G.     For such additional relief as the Court may deem just and proper.

### THIRD CAUSE OF ACTION
(Contract Implied in Fact – Helm & First Union)

66.     Black Iron hereby realleges and incorporates by reference all paragraphs hereinabove, as though specifically set forth herein.

10

67.     First Union requested that Black Iron allow First Union to keep the railcars and locomotives on Black Iron's tracks until they could be removed.

68.     If the railcars and locomotives were not removed by June 1, 2015 Black Iron expected First Union would pay storage fees.

69.     From the May 8, 2015 phone call First Union knew Black Iron expected to be paid if the railcars and locomotives were not removed.

70.     To the extent Helm retains an ownership interest or control over the railcars or locomotives it is complicit and jointly liable with First Union.

WHEREFORE, Black Iron prays for relief and judgment from this Court as follows:

A.      Judgment in the amount of $17,391,000.00.00 as of July 8, 2016, and continuing thereafter at rate of $52,700.00 *per diem*;

B.      Prejudgment interest as allowed by Utah Code Ann. § 15-1-1 in the amount of $913,452.71 as of July 8, 2016 and continuing to accrue thereafter at the rate of $4,511.99 *per diem*;

C.      Incidental and consequential damages of $10,000,000.00;

D.      Prejudgment attorney fees and all costs of court as allowed by contract and by law;

E.      Post-judgment interest Utah Code Ann. § 15-1-1;

F.      Post-judgment attorney fees and all costs of court as allowed contract and by law; and

G.      For such additional relief as the Court may deem just and proper.

11

## FOURTH CAUSE OF ACTION
(Unjust Enrichment – Helm & First Union)

71.     Black Iron hereby realleges and incorporates by reference all paragraphs hereinabove, as though specifically set forth herein.

72.     After First Union failed to remove the railcars from Black Iron's tracks, it received the benefit of being able to store its railcars on Black Iron's tracks without paying any storage fees.

73.     Throughout multiple communications between Black Iron and First Union discussing the presence of the railcars, the need to move the railcars, and First Union's lack of diligence in removing the railcars, it is evident that First Union had knowledge and appreciation that its railcars were on privately-owned tracks for which it was receiving a benefit.

74.     As of May 6, 2015, Black Iron owned the tracks and conferred the benefit on First Union.

75.     On February 24, 2016, First Union's president, Barbara Wilson; stated:

Rail equipment demand in the aggregate tends to follow railcar loadings in the aggregate, and 2016 is off to a soft start for both. Crude oil and sand shipment volumes are down meaningfully due to weakness in the energy space, and coal volumes remain depressed due to numerous new regulations combined with mild weather. (**Exhibit "B"**).

76.     Currently, the depression in the coal industry has diminished the demand for open-top hopper cars of the type which First Union is storing on Black Iron's tracks.  Thus, were it not for the presence of the railcars on these tracks, First Union would be paying to store the railcars and locomotives elsewhere.

77.     Since the mass storage of railcars for coal products has consumed a substantial

12

amount of available storage space, and since it is difficult to find places to store the railcars, First Union has allowed the railcars to remain on Black Iron's tracks and derived the storage benefit of that, which is unjust and inequitable.

78.     To the extent Helm retains an ownership interest or control over the railcars or locomotives, it is complicit and jointly liable with First Union.

WHEREFORE, Black Iron prays for relief and judgment from this Court as follows:

A.     Judgment in the amount of $17,391,000.00 as of July 8, 2016, and continuing thereafter at rate of $52,700.00 *per diem*;

B.     Prejudgment interest as allowed by Utah Code Ann. § 15-1-1 in the amount of $913,452.71 as of July 8, 2016 and continuing to accrue thereafter at the rate of $4,511.99 *per diem*;

C.     Incidental and consequential damages in an amount to be proven at trial but not less than $10,000,000.00;

D.     Prejudgment attorney fees and all costs of court as allowed by contract and by law;

E.     Post-judgment interest Utah Code Ann. § 15-1-1;

F.     Post-judgment attorney fees and all costs of court as allowed contract and by law; and

G.     For such additional relief as the Court may deem just and proper.

### FIFTH CAUSE OF ACTION
(Warehouse Lien – Helm, First Union & DOES 1-15)

79.     Black Iron incorporates and alleges all prior paragraphs.

13

80.    Since closing the asset purchase, Black Iron has been warehousing the railcars and locomotives by providing safekeeping and providing security.

81.    Black Iron agreed to store First Union's railcars and locomotives on its tracks without charge only until June 1, 2015.

82.    Upon information and belief DOES 1-15 are individual or organizations who may have some interest in the railcars or locomotives and such interest is inferior and subject to Black Iron's possessory lien.

WHEREFORE, Black Iron prays for relief and judgment from this Court as follows:

A.    An order foreclosing the interests of First Union, HELM, CML and Does 1-15 in the locomotives and ordering the Sheriff of Iron County to sell the railcars and equipment collectively or individually in satisfaction of the debt as set for the below, and to pay all costs of sale from the proceeds and to Black Iron:

B.    Judgment in the amount of $17,391,000.00 as of July 8, 2016, and continuing thereafter at rate of $52,700.00 *per diem*;

C.    Prejudgment interest as allowed by Utah Code Ann. § 15-1-1 in the amount of $913,452.71 as of July 8, 2016, and continuing to accrue thereafter at the rate of $4,511.99 *per diem*;

D.    Incidental and consequential damages of $10,000,000.00;

E.    Prejudgment attorney fees and all costs of court as allowed by contract and by law;

F.    Post-judgment interest Utah Code Ann. § 15-1-1;

G.    Post-judgment attorney fees and all costs of court as allowed contract and by law;

14

and

H.      For such additional relief as the Court may deem just and proper.

### **SIXTH CAUSE OF ACTION**
(Promissory Estoppel/Indemnity – Conboy, CML & ROES 1-15)

83.     Black Iron incorporates and alleges all prior paragraphs.

84.     On April 2, 2015, Black Iron executed a note in favor of Conboy ("Note").

85.     The amount of the Note is $2,902,900.06.

86.     Black Iron executed the Note and the Asset Purchases Agreement in reliance on the promise from CML to indemnify Black Iron by retaining claims between CML and First Union.

87.     Before and after execution of the Asset Purchase Agreement and the Note, Conboy promised to retain claims and indemnify Black Iron from liability, charges, costs, expenses, or losses associated with First Union and the railroad.

88.     Upon information and belief, when Conboy made his promises to Black Iron, he may have been acting individually or on behalf of CML and/or the instance of its officers and directors.

89.     Conboy, CML and ROES 1-15 are equitably bound to resolve all matters relating to the storage and removal of the railcars and locomotives.

90.     Black Iron has expended money for security and safekeeping of the railcars.

91.     Black Iron is also incurring expenses to proceed with this action to have the railcars and locomotives removed.

92.     Despite demands from Black Iron, Conboy; CML; and ROES 1-15 have failed to

15

fulfill their obligations to Black Iron.

93.     Since CML and First Union are in litigation and Black Iron is suffering losses, as a result of First Union's railcars and locomotives being stored on Black Iron's tracks, Black Iron is suffering damages because it is not receiving storage payments from First Union and cannot operate the mine, use its tracks, or otherwise conduct business.

WHEREFORE, Black Iron prays for relief and judgment against Conboy as follows:

A.     Judgment in the amount of $17,391,000.00 as of July 8, 2016, and continuing thereafter at rate of $52,700.00 *per diem*;

B.     Prejudgment interest as allowed by Utah Code Ann. § 15-1-1 in the amount of $913,452.71 as of July 8, 2016 and continuing to accrue thereafter at the rate of $4,511.99 *per diem*.

C.     Incidental and consequential damages in an amount to be proven at trial but not less than $10,000,000.00

D.     Prejudgment attorney fees and all costs of court as allowed by contract and by law;

E.     Post-judgment interest Utah Code Ann. § 15-1-1;

F.     Post-judgment attorney fees and all costs of court as allowed contract and by law;

If Conboy was acting in whole or in part on behalf of other individuals, Black Iron seeks judgment jointly and severally against Roes 1-15 as follows:

G.     Judgment in the amount of $17,391,000.00 as of July 8, 2016, and continuing thereafter at rate of $52,700.00 *per diem*;

H.     Prejudgment interest as allowed by Utah Code Ann. § 15-1-1 in the amount of

16

$913,452.71 as of July 8, 2016 and continuing to accrue thereafter at the rate of $4,511.99 *per diem*.

I.    Incidental and consequential damages in an amount to be proven at trial but not less than $10,000,000.00;

J.    Prejudgment attorney fees and all costs of court as allowed by contract and by law;

K.    Post-judgment interest Utah Code Ann. § 15-1-1;

L.    Post-judgment attorney fees and all costs of court as allowed contract and by law;

Moreover if Conboy was acting in whole or in part on behalf of CML, Black Iron seeks judgment jointly and severally against CML as follows:

M.    Judgment in the amount of $17,391,000.00 as of July 8, 2016, and continuing thereafter at rate of $52,700.00 *per diem*;

N.    Prejudgment interest as allowed by Utah Code Ann. § 15-1-1 in the amount of $913,452.71 as of July 8, 2016 and continuing to accrue thereafter at the rate of $4,511.99 *per diem*.

O.    Incidental and consequential damages in an amount to be proven at trial, but not less than $10,000,000.00;

P.    Prejudgment attorney fees and all costs of court as allowed by contract and by law;

Q.    Post-judgment interest Utah Code Ann. § 15-1-1;

R.    Post-judgment attorney fees and all costs of court as allowed contract and by law; and

17

S.      For such additional relief as the Court may deem just and proper.

**JURY DEMAND**

Pursuant to Rule 38(a) Utah R. Civ. P. Black Iron hereby respectfully and formally requests

this matter be heard and adjudicated by a jury.

DATED: this 12th day of July, 2016

**SMITH KNOWLES, P.C.**

/s/ Dana T. Farmer

_____

Dana T. Farmer
Thomas W. Farrell
Ken Brown
*Attorneys for Plaintiff, Black Iron, LLC*

Filed for:
Black Iron, LLC
6249 West Gilbert Industrial Court
Hurricane, Utah 84737

18



**BUILDING AMERICA***

# Demurrage and Storage Policy Changes Effective April 1, 2016

**Announcement Number:** CN2016-1
**Categories:** General Announcements
**Posted Date:** January 4, 2016

To Our Customers,

In an effort to improve network fluidity, bolster capacity and improve equipment utilization, Union Pacific Railroad will be modifying its General Demurrage and Private Empty Car Storage Rules & Charges Policy, effective April 1, 2016.

Union Pacific is focused on reducing excessive rail car dwell on our tracks and in our terminals. While volume is variable from year to year, rail cars holding in our yards is not. This new approach is designed to address this issue by differentiating hold charges between yard and industry tracks. Fluid rail yards support Union Pacific's mission to deliver safe and reliable service to all of our customers.

**Under the new plan,** debits will be issued based on the consumption of both railroad controlled equipment and yard capacity. Debits issued for cars on spot will not change from the current program. To this effect, railroad controlled cars held at industry will continue to be billed a debit of $100 per day, refrigerated cars at a debit of $200 per day, while private cars at industry will remain non-chargeable.

The changes apply to cars that are **held on Union Pacific yard tracks** and are as follows:

› Non-hazardous railroad controlled cars will increase by $100 per day, bringing the daily debit to $200 per day.

› Refrigerated cars will increase by $100 per day, bringing the daily debit to $300 per day.

› Private loads will continue to have debits accrue at $100 per day. Given their private ownership, these cars are only charged for consuming yard capacity.

› Private Empty Car Storage (PECS) rates will increase from $70 per day to $100 per day.

› Hazardous car debits will remain at $250 per day.

› Capacity credits will be issued at the new yard debit rate in consideration of service days or failed service events.

Additional information on your estimated impact will be made available to your Union Pacific representative. Please contact your representative with questions and to discuss throughput improvement ideas so that any changes can be implemented in advance of the new policy.

We value your business and want to provide the best service product possible. Please contact your Union Pacific representative with any questions.

**EXHIBIT**

**"A"**

 **BUILDING AMERICA**

# Private Empty Car Storage

### Storage Charges

> Receiver of the empty rail car will be assessed the charges for all Net Chargeable Storage Days for all empty private equipment.

> Charges will be assessed to all Industrial Products, Agricultural and Chemicals customers.

> Net Chargeable Storage Days equals total debits less credits earned.

> The current storage fee is $100 per Net Chargeable Storage Day.

> Storage Policy Changes Effective April 1, 2016 [http://www.up.com/customers/announcements/custo 1.html]

### Debits

> One (1) debit will be assessed for every full or partial day that a private empty car is in hold status on the Union Pacific network, commencing on the first 12:00 a.m. after the equipment has been placed in hold status.

> Debits will be assessed at any origin, destination, or intermediate holding location.

> Debits will be issued to the Receiver location of the empty rail car.

> Debits will not be assessed for empty private equipment on private track.

> On the first 12:00 a.m. after equipment has been released from hold status, debits will cease to accrue.

> Debits will not accrue if cars remain in released hold status.

### Credits

Credits are issued to the Receiver of the empty rail car. There are three methods of earning credits:

> Actually Placed (AP) Credits: One (1) credit will be issued for each private empty rail car on the day it is actually placed at destination industry.

> Placement Credits: If an Order-in customer orders a specific private empty rail car via the Web or Interactive Voice Recognition (IVR), which has arrived in the customer's serving area, but UP does not deliver the car, or delivers an alternative car, two (2) credits per rail car will be issued for each rail car requested but not actually placed. Placement Credits will only be given if the private empty rail car released returns to a hold status instead of being placed at the customer's facility (actually placed). Once the car returns to hold status, the credits will be applied. Cars which are not delivered and stay in a release from hold status will not receive placement credits nor will they receive debits.

> Capacity Credits: When a Spot-on Arrival customer has available capacity and UP does not bring in a car(s) to fill that capacity, two (2) credits will be issued for each private empty rail car in the serving area up to the customer's maximum available capacity.

### Billing

> Bills will be issued monthly for the prior calendar month's inventory.

> If credits exceed debits, no storage bill will be generated.

> Credits are only valid in the month they are earned and will not be carried over to subsequent months.

PECS is part of the Accessorial Management Application (AMA). AMA provides activity from the current month, along with a link to outstanding bills from previous months. Customers have the ability to dispute in the current month, prior to the bill being issued.

Post-bill general disputes can be handled using Account on the Web (AOW). To use the AOW functionality, customers must be registered with AOW and have a MyUPRR user ID.

### Additional Resources - FAQ

> Read PECS Frequently Asked Questions    for additional information.

This information is provided for the convenience of our customers. This document is a representation of Union Pacific Accessorial Tariff UP 6004. In the event of a conflict, actual published Union Pacific Accessorial Tariff UP 6004 will apply. A copy will be available upon request. To subscribe to this tariff, contact the eBusiness Team at 800-872-1045.

Wednesday, February 24, 2016

EXHIBIT

"B"

# Rail equipment market: "Slow and steady growth, positive and healthy"

Written by David Nahass, Financial Editor



Wells Fargo Rail President Barbara Wilson

As many readers of the "Financial Edge" know, the end of 2015 saw the purchase of General Electric Railcar Services, one of the largest and in some ways oldest of the operating lessor companies that lease railcars to their customers on primarily shorter (think seven years and less) lease terms.

Wells Fargo Rail (formerly First Union Rail) purchased the majority of the cars and locomotives, and Union Tank Car Company (a unit of Warren Buffet's Berkshire Hathaway) purchased the tank railcars and railcar repair shops. This is a dramatic change in the railcar leasing marketplace.

I had a chance to sit down with Wells Fargo Rail President Barbara Wilson and ask her about the acquisition, the outlook for the company and how she views today's railcar leasing market.

Financial Edge: Post-GE acquisition, what's the size of WFR?

Barbara Wilson: We were delighted to close on the acquisition of GE Railcar Services on Jan. 1, 2016. This acquisition allowed us to expand our available fleet of rail equipment by more than 77,000 railcars and 1,000 locomotives. In addition, on that date we rebranded the company to Wells Fargo Rail. We are very proud to take on our parent company name. Our fleet of equipment available for lease now totals more than 174,000 railcars and 1,800 locomotives. That fleet is very diversified, but heavily focused on freight cars. At this time we own fewer than 10,000 tank cars but look forward to growing that portion of our fleet to continue to support the needs of our customers. In addition, we manage more than 20,000 railcars on operating leases for other owners.

FE: To which market segments do you feel is WFR particularly exposed right now? Is that exposure something that immediately begins to require active management, or as a result of the overall scale of WFR do individual market segments not move the needle in the way they used to in the past?

BW: Our present railcar fleet diversification largely mirrors the diversification of the North American railcar fleet. Therefore we do have meaningful exposure to coal, sand, grain and centerbeams. As you know, the strong U.S. dollar has negatively impacted virtually all commodities that get exported. We see weakness in the volumes of those commodities (steel, scrap, grain etc.) and therefore reduced demand for railcars to move those commodities. We have a very small tank car fleet, and our Packing Group 3 tank car fleet consists of fewer than 2,500 cars, so our exposure to the new tank car design regulations is very limited. Our locomotive operating lease fleet consists primarily of high quality four-axle road and switcher units. Presently there is some weakness in demand for those units due to the decrease in rail freight volumes.

FE: In what markets does WFR maintain limited exposure? Do those markets, now in retrospect, offer you vindication vs. the peer (or previously peer) group that is also working to grow?

BW: We are clearly underweighted in tank cars. That is because we entered that market late and were very selective in the equipment we acquired. Prior to July 2013 no one saw the significant new equipment specifications coming for flammable liquid tanks, so our position is somewhat a result of luck, not planning. Today we see the tank car market as very attractive to invest in. We hope to expand our customer base through investment in the tank car market and are committed to supporting the needs of our existing customers through investment in the tank cars that they require.

FE: GE had made market noise for years about selling its operating lease fleet, and throughout your career you had participated in a number of evaluations of that fleet. What made the final push successful this time around?

BW: We were fortunate that in April 2015 the management and board of directors at GE corporate decided to exit the financial services business and focus on industrial technology businesses. The GE Rail business was put up for sale as a result of that decision, not due to specific qualities of the GE Rail business. Once we saw the detail and the quality of the GE Rail fleet, we knew it would be a very complementary and accretive acquisition for our business. Most important, we believe that our acquisition of the fleet allows us to better serve our customers. With a significantly larger inventory of assets, we are much better positioned to have the railcars and locomotives needed by our customers, allowing us to be a better strategic partner to them.

FE: Are there risks in a relationship business of being too big?

BW: The breadth of our fleet means that we serve many different customers in many different businesses. The Wells Fargo vision is, "We want to satisfy our customers' financial needs and help them succeed financially." In the rail operating lease business, that requires us to have the assets that our customers need to operate their business. Wells Fargo has committed a large amount of capital to the rail operating lease business with the goal of better serving the needs of our customers. We believe customers in our all business segments can be better served, and save time and money, if they bring their rail equipment needs to one trusted provider that knows them well, provides reliable guidance and advice, and can serve their full range of equipment needs through a wide choice of products and services. That is why we have made billions of dollars of investments in all railcar types, why we have a fleet of locomotives available for lease, and why we provide management services to owners of railcar assets that need a hands-on, fully in-house staffed asset management partner.

FE: Will the market see some large offerings of excess product from the WFR to begin rebalancing the fleet or to reduce exposure to certain markets?

BW: As you can imagine, the integration of the GE Rail fleet into our legacy fleet will take some time. That integration requires that we fully understand the needs of our customers and analyze how our existing fleet aligns with those needs. Our company has not historically been a large seller in the secondary market because of the impact that selling has on our customer base. By the second half of this year we will be in a much better position to assess our fleet mix and answer the question on future asset sales.

Dana T. Farmer (8371)
Thomas W. Farrell (13697)
Ken Brown (15554)
**SMITH KNOWLES, P.C.**
2225 Washington Blvd., Suite 200
Ogden, UT 84401
Telephone:    (801) 476-0303
Facsimile:     (801) 476-0399
Email: dfarmer@smithknowles.com

Cyndi W. Gilbert (4513)
cwg@infowest.com
P.O. Box 190
1091 South Toquerville Blvd.
Toquerville, UT 84774

*Attorneys for Plaintiffs.*

IN THE FIFTH JUDICIAL DISTRICT COURT OF IRON COUNTY

CEDAR CITY DEPARTMENT, STATE OF UTAH

| | |
|---|---|
| BLACK IRON, LLC, a Utah limited liability company;<br><br>  Plaintiff,<br><br>vs.<br><br>HELM PACIFIC aka HELM PACIFIC LEASING, a Nebraska general partnership; FIRST UNION RAIL CORPORATION d/b/a WELLS FARGO RAIL, a North Carolina corporation; CML HOLDINGS, a Delaware corporation; CML METALS CORPORATION, a corporation; MICHAEL W. CONBOY, an individual, DOES 1-15 and ROES 1-15,<br><br>  Defendants. | **SUMMONS**<br>**(30 DAY)**<br><br>Civil No. 160500102<br><br>Judge Keith C. Barnes |

THE STATE OF UTAH TO THE ABOVE-NAMED DEFENDANT:

FIRST UNION RAIL CORPORATION d/b/a WELLS FARGO RAIL
c/o: Douglas P. Farr
SNELL & WILMER
Gateway Tower West
15 West South Temple, Ste. 1200
Salt Lake City, Utah 84101-1547
DFARR@SWLAW.COM

You are hereby summoned and required to file an answer in writing to the attached Complaint with the Clerk of the above-entitled Court, **40 North 100 East, Cedar City, Utah 84720**, and to serve upon or mail to Dana T. Farmer of SMITH KNOWLES, attorney for Plaintiff, BLACK IRON, LLC; at 2225 Washington Blvd., Suite 200, Ogden, Utah, 84401, (801) 476-0303, a copy of your Answer within 30 days after service of this Summons upon you.

If you fail so to do, judgment by default will be taken against you for the relief demanded in the Complaint, which has been filed with the Clerk of the above-entitled Court and a copy of which is annexed hereto and served herewith upon you.

DATED this 12ᵗʰ day of July, 2016

SMITH KNOWLES

Dana T. Farmer
*Attorney for Plaintiff, Black Iron, LLC*

Dana T. Farmer (8371)
Thomas W. Farrell (13697)
Ken Brown (15554)
**SMITH KNOWLES, P.C.**
2225 Washington Blvd., Suite 200
Ogden, UT 84401
Telephone:     (801) 476-0303
Facsimile:     (801) 476-0399
Email: dfarmer@smithknowles.com

*Attorneys for Plaintiffs.*

Cyndi W. Gilbert (4513)
cwg@infowest.com
P.O. Box 190
1091 South Toquerville Blvd.
Toquerville, UT 84774

---

## IN THE FIFTH JUDICIAL DISTRICT COURT OF IRON COUNTY

## CEDAR CITY DEPARTMENT, STATE OF UTAH

| | |
|---|---|
| BLACK IRON, LLC, a Utah limited liability company;<br><br>Plaintiff,<br><br>vs.<br><br>HELM PACIFIC aka HELM PACIFIC LEASING, a Nebraska general partnership; FIRST UNION RAIL CORPORATION d/b/a WELLS FARGO RAIL, a North Carolina corporation; CML HOLDINGS, a Delaware corporation; CML METALS CORPORATION, a corporation; MICHAEL W. CONBOY, an individual, DOES 1-15 and ROES 1-15,<br><br>Defendants. | **WAIVER OF SERVICE AND ACCEPTANCE OF SUMMONS**<br><br>Civil No. 160500102<br><br>Judge Keith C. Barnes |

TO:    **Dana T. Farmer**
          **SMITH KNOWLES, P.C.**
          **2225 Washington Blvd., Suite 200**
          **Ogden, Utah 84401**
          ***Attorney for Plaintiff, Black Iron, LLC***

Black Iron, LLC v Helm Pacific/1ˢᵗ Union Rail Corp., et al.; Civ. No.  160500102
Waiver of Service and Acceptance of Summons

I acknowledge receipt of your request that I waive service of a summons in the action of *Black Iron, LLC v Helm Pacific a/k/a Helm Pacific Leasing, et al.,* which is pending in Fifth District Court, Cedar City Department, Civil Number 160500102.   I have also received a copy of the **Complaint, Summons, and Exhibits** in this action.

I agree to save the cost of service of a summons and an additional copy of the Complaint in this lawsuit by not requiring that my client, Defendant, FIRST UNION RAIL CORPORATION d/b/a WELLS FARGO RAIL ("First Union Rail Corp."), be served with judicial process in the manner provided by Rule 4.   First Union Rail Corp. will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the court, except for objections based on a defect in the summons or in the service of the summons.

I understand that a judgment may be entered against First Union Rail Corp. if an answer or motion under Rule 12 is not served upon you within 45 days after the request was sent, which was July 12, 2016.

DATED: this 15th day of July, 2016.

SNELL & WILMER

Douglas P. Farr
*Attorney for Defendant, First Union Rail
Corporation d/b/a Wells Fargo Rail*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the *WAIVER OF SERVICE AND ACCEPTANCE OF SUMMONS* was delivered via email this 12th day of July, 2016, to the following:

> Douglas P. Farr
> Snell & Wilmer
> Gateway Tower West
> 15 West South Temple, Ste. 1200
> Salt Lake City, Utah 84101-1547
> DFARR@SWLAW.COM
> *Attorney for Defendant*
> *First Union Rail Corporation d/b/a Wells Fargo Rail*

/S/ Edela Irvin
_____
Paralegal